UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

DAVON MILLER,
    *Plaintiff,*

v.

OFFICER MANN *et al.,*
    *Defendants*.

No. 3:17-cv-01555 (JAM)

**ORDER GRANTING IN PART AND DENYING IN PART
DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Plaintiff Davon Miller was a pretrial detainee in the custody of the Connecticut Department of Correction (DOC). He alleges that within moments of his transfer to a new cell he was brutally attacked without provocation by his cellmate who was a convicted prisoner. According to Miller, the defendant correctional officers knew or recklessly should have known of his cellmate's violent propensity but they were deliberately indifferent to Miller's safety.

Defendants have now moved for summary judgment. Although I will grant their motion in part, I will deny it in large part on the issue of whether the defendants acted with deliberate indifference to Miller's safety. I conclude that Miller is entitled to additional discovery about his attacker's prior assault and disciplinary history.

**BACKGROUND**

The following facts are set forth as admissible for summary judgment purposes and in the light most favorable to Miller as the non-moving party. Miller was a pretrial detainee at MacDougall-Walker Correctional Institution. He was incarcerated on a burglary charge. Doc. #47-8 at 51.

1

On August 16, 2017, Miller was at MacDougall's medical unit when he was assigned to be transferred to the Restrictive Housing Unit (RHU), a unit that is commonly called "segregation." Doc. #41-6 at 1. Defendant Mann was a correctional officer who was working that day on MacDougall's RHU. At about 2:30 p.m., he received a call advising that Miller was ready for escort from the medical unit to RHU. Mann went to the medical unit, secured Miller in handcuffs and escorted him to RHU. *Ibid.*

According to the warden of MacDougall, "there were space issues that necessitated doubling up RHU cells." Doc. #47 at 8. So Mann took took Miller to cell #5 on the second tier of the unit. That cell was already occupied by a convicted inmate named Mark Silver. *Ibid.*[1]

In accordance with standard procedure, Mann ordered Silver to place his hands through the cell door trap, then he applied handcuffs to Silver, and ordered him to the back of the cell away from the cell door. Silver complied. The door to the cell was then opened, and Mann ordered Miller to enter the cell. Mann handed Miller a bag with his clothing, and the cell door was closed. Mann then directed both Miller and Silver to place their hands through the cell trap door for removal of handcuffs. Both Mann and Silver complied, and their handcuffs were removed. Mann then closed the cell trap door, and he proceeded to tour the rest of the unit. Doc. #41-6 at 1-2.

---

[1] Defendants' submission reflects an inmate identification number for Silver. Doc. #47-8 at 5. The Court takes judicial notice that a search of inmate Silver's name and his identification number on the DOC's publicly available "Inmate Information" website reflects that Silver has been serving time since being sentenced in November 2008 a maximum sentence of 41 years for "Criminal Attempt." The Court takes further judicial notice of reported decisions of the Connecticut courts that a defendant named Mark Silver was convicted after trial in 2008 for attempted murder and first-degree assault and sentenced to a term of 40 years of imprisonment. *See State v. Silver*, 2013 WL 1277166, at *1 (Conn. Super. Ct. 2013) (sentence review decision describing trial evidence that Silver used a car as a weapon to run over a victim multiple times, leaving him a quadriplegic, and Silver's "history of violence" and that Silver "blames the victim for his own injuries," despite having "a history of felonious conduct and cruelly subject[ing] the victim to serious physical injury").

At no time during these events did Miller express concern to Mann about his safety. Nor did Silver speak to Mann during these events, and Mann did not hear him express any hostility toward Miller. *Id.* at 2.

After Mann finished touring the remainder of the tier, he walked back toward cell #5 and heard a commotion. He saw Miller and Silver in an altercation. When they would not respond to his commands to stop, he entered the cell with other officers and used mace. Miller and Silver were then separated. *Ibid.*

According to Miller, Silver attacked him right away after he was placed in the cell, and he did not have a chance to fight back. Doc. #44 at 14. In his verified complaint, he alleges that "[w]hen I entered the cell I went to use the bathroom and [Silver] assaulted me and repeatedly smashed my head against a steel toilet until I was unconscious." Doc. #23 at 5; Doc. #44 at 32 (summary judgment affidavit).

Miller sustained a 3-inch laceration of his cheek. Doc. #47-8 at 6. He received stitches in the medical unit due to a "serious gash" in his cheek. *Id.* at 14. Miller also alleges additional injuries including "two black eyes, . . . a blood clot in my right eye, bone fracture in my right eye socket, a swollen jaw and a huge cut on my my right eyes." Doc. #23 at 5.

The DOC's preliminary investigation disclosed that it was Silver who assaulted Miller. Doc. #47-8 at 6. According to an incident report written by Mann, when he took part in moving Silver to another cell soon after the incident, "Silver made comments about harming any cell mate he would be housed with." *Id.* at 35.

Another incident report (written by Lieutenant Valentin) recounts that, after the altercation with Miller, when correctional officers tried to place Silver in cell #13 of the RHU with another inmate, "Silver made several verbal threats that he would assault the current inmate

3

housed in 13 cell and any other inmate we placed him with. He stated that if we continue to place him with other inmates that he would continue to assault them." *Id.* at 7. "Once secured Silver stated to this supervisor that he simply assaulted Miller because of him being housed in his cell. He stated that he will continue to assault any other inmates placed in his cell." *Ibid.*

Still another incident report that is based on a review of post-incident video quotes Silver's statements at the time that he was about to be placed in cell #13 with another inmate: "I am going to fuck him up." "Any cellie." "I just sent one to UCONN." *Id.* at 48.

A deputy warden wrote in another incident report: "After a preliminary inquiry I/M Silver was identified as an 'Assailant' and was issued disciplinary reports for 'Assault' & 'Threats' and was removed from In-Cells just before the twelve hour mark. After conferring with Day Watch Commander / Capt. Ogando the incident can be attributed to the assaultive nature of inmate Silver and can be classified as 'isolated.'" Doc. #47-8 at 6.

As noted above, the record shows that it was defendant Mann who placed Miller in the cell with Silver. The record also shows that defendant Cavanaugh (then a lieutenant and now a captain) responded to the scene after a "Code Blue" emergency was called while Silver was assaulting Miller. Incident reports reflect that Cavanaugh exercised general supervisory functions including ordering that Miller be taken to the medical unit, instructing the activation and deactivation of a video camera, and also calling off the Code Blue. Doc. #47-8 at 14, 25, 57, 59, 63.

The record does not reflect whether Silver has a history known to defendants or any DOC personnel of assaulting inmates or correctional officers. That is because defendants refused Miller's discovery request for documents about Silver's prior disciplinary and assault history as

well as for the names of correctional officials who were involved with responding to prior assaults. Doc. #44 at 29-30 (Document Requests #2 and #3).

After the incident, Miller filed internal grievances. The first grievance that he filed on September 26, 2017, was returned without disposition because of his failure to exhaust the informal resolution process that is required under DOC grievance procedures. *See generally Davis v. Williams*, 2019 WL 1012008, at *1 (D. Conn. 2019) (describing basic rules of DOC grievance process).

Miller followed up with a second grievance on October 2, 2017, in which he complained that both Mann and Cavanaugh were responsible for placing him in a cell with an inmate who was known to be dangerous. Doc. #41-3 at 43. He complained that he had been placed by Mann at the instruction of Cavanaugh in a cell with an inmate who "has mental health issues and a history of beating up his cellmates because he wants single cell status and he tells C.O's and LT's up front what he wants, yet I was still placed in the cell with no warning and when placed in the cell I was assaulted." *Ibid.*

On November 2, 2017, this grievance was denied on grounds that there was no evidence to substantiate Miller's claim of staff misconduct. *Ibid.* Miller timely filed a grievance appeal, and the DOC denied this appeal on grounds that "[s]taff had no prior knowledge that you would be assaulted prior to placing you in cell 5 of RHU." Doc. #41-3 at 47.

In the meantime, Miller filed this federal lawsuit on September 15, 2017, alleging multiple claims against multiple defendants. Doc. #1. On December 28, 2017, I issued an initial review order that dismissed Miller's claims against several defendants, while allowing in relevant part two of Miller's claims to proceed: (1) against Mann and Cavanaugh for deliberate

indifference to safety; and (2) against Mann for the use of excessive force. *See Miller v. Mann*, 2017 WL 6624007 (D. Conn. 2017).[2]

## DISCUSSION

The principles governing the Court's review of a motion for summary judgment are well established. Summary judgment may be granted only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). I must view the facts in the light most favorable to the party who opposes the motion for summary judgment and then decide if those facts would be enough—if eventually proved at trial—to allow a reasonable jury to decide the case in favor of the opposing party. My role at summary judgment is not to judge the credibility of witnesses or to resolve close contested issues but solely to decide if there are enough facts that remain in dispute to warrant a trial. *See generally Tolan v. Cotton*, 572 U.S. 650, 656–57 (2014) (*per curiam*); *Pollard v. N.Y. Methodist Hosp.*, 861 F.3d 374, 378 (2d Cir. 2017).

### *Exhaustion of administrative remedies*

Defendants argue that Miller failed to exhaust his administrative remedies as required under the Prison Reform Litigation Act (PLRA). The PLRA states that "no action shall be brought with respect to prison conditions . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement applies to all claims regarding "prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). Exhaustion of all

---

[2] The Court also allowed to proceed a First Amendment claim against defendant Beebe, but Miller has now expressly abandoned this claim. Doc. #44 at 39. Because of a misspelling in Miller's complaint, the Court's initial review order referred to defendant Cavanaugh as "Cavagnoff". The Clerk of Court is requested to correct the name to "Cavanaugh" in the case caption.

available administrative remedies must occur regardless of whether the administrative procedures provide the relief that the inmate seeks. *See Booth v. Churner*, 532 U.S. 731, 740-41 (2001). Furthermore, prisoners must comply with all procedural rules regarding the grievance process prior to commencing an action in federal court. *See Woodford v. Ngo*, 548 U.S. 81, 90-93 (2006).

As to Miller's excessive force claim against Mann arising from Mann's use of mace to separate Miller and Silver during their altercation, I conclude that Miller did not properly exhaust that claim. Neither his grievance of October 2, 2017, nor his grievance appeal raised any complaint about Mann's use of excessive force. Doc. #41-3 at 43, 47; *Hill v. Curcione*, 657 F.3d 116, 125 (2d Cir. 2011) (dismissing claim as to defendant not named in grievance).[3] Accordingly, I will dismiss Miller's excessive force claim for failure to properly exhaust his administrative remedies.

I reach a contrary conclusion as to Miller's claim for deliberate indifference to his safety. While it is true that Miller did not timely file his grievance within 30 days of the incident as required under DOC exhaustion rules, *see Davis*, 2019 WL 1012008, at *1, the DOC did not end up denying the grievance on timeliness grounds but instead determined at both the initial and appeal stages that it lacked substantive merit. Docs. #41-3 at 43, 47. In such circumstances, the Second Circuit has ruled that "the exhaustion requirement of the PLRA is satisfied by an untimely filing of a grievance if it is accepted and decided on the merits by the appropriate prison authority." *Hill*, 657 F.3d at 125. Therefore, I will consider the merits of Miller's claim against Mann and Cavanaugh for deliberate indifference to his safety.

---

[3] Miller's first attempted grievance of September 26, 2017, raised a claim for excessive force, Doc. #41-3 at 37-38, but this grievance was properly returned without disposition for failure of Miller to initially seek informal resolution as required by prison grievance regulations. *Id.* at 40; *Davis*, 2019 WL 1012008, at *2. When Miller renewed the grievance on October 2, 2017, he did not include any complaint about Mann's alleged use of excessive force.

7

*Deliberate indifference to safety*

The Supreme Court has ruled that, although "the Constitution does not mandate comfortable prisons," prison officials must protect inmates' safety, and "prison officials have a duty . . . to protect prisoners from violence at the hands of other prisoners." *Farmer v. Brennan*, 511 U.S. 825, 832-33 (1994). Therefore, "[a] prison official's deliberate indifference to a substantial risk of serious harm to an inmate violates the Eighth Amendment." *Id.* at 828.

Under the Eighth Amendment, a claim for deliberate indifference to prison safety has both an objective and subjective component. First, the plaintiff must prove that the harm was objectively serious, and then the plaintiff must prove that a defendant acted with subjective or actual awareness of a substantial risk that serious harm will result. *See Spavone v. New York State Dept. of Correctional Servs.*, 719 F.3d 127, 138 (2d Cir. 2013).

But because Miller was a pretrial detainee, rather than a convicted inmate, he was entitled to a higher standard of care than required under the Eighth Amendment. As the Second Circuit has made clear, a pretrial detainee's claim for deliberate indifference to his safety is governed by the Due Process Clause instead of the Eighth Amendment. *Darnell v. Pineiro*, 849 F.3d 17, 29 (2d Cir. 2017). "Pretrial detainees have not been convicted of a crime and thus may not be punished in any manner—neither cruelly and unusually nor otherwise." *Ibid.* (cleaned up). Therefore, "[a] detainee's rights are at least as great as the Eighth Amendment protections available to a convicted prisoner." *Ibid.* (cleaned up).

According to the Second Circuit, a pretrial detainee who claims deliberate indifference to his safety must show an objective risk of serious harm, *id.* at 30, but—unlike for an Eighth Amendment claim—need not necessarily show that a charged official was subjectively aware of the risk of harm: "[T]o establish a claim for deliberate indifference to conditions of confinement

under the Due Process Clause of the Fourteenth Amendment, the pretrial detainee must prove that the defendant-official acted intentionally to impose the alleged condition, *or recklessly failed to act with reasonable care to mitigate the risk* that the condition posed to the pretrial detainee even though the defendant-official knew, *or should have known*, that the condition posed an excessive risk to health or safety." *Id.* at 35 (emphasis added). "A detainee must prove that an official acted intentionally or recklessly, and not merely negligently." *Ibid.*

The record before me here does not allow for a reliable conclusion as to whether Mann or Cavanaugh was deliberately indifferent to the risk of harm to Miller. That is because defendants refused to comply with Miller's discovery request for "[a]ny and all DR Reports, and incidents involving inmate Silver (assaults, inmates pressing charges against him, CO Assaults, etc.)," and for "Names of all C.O.'s, L.T., and Captains who were involved in stopping inmate Silver's assaults or mental outbursts." Doc. #44 at 29-30. Rather than producing any records of any prior incidents involving Silver, defendants solely produced "the incident report related to the event alleged by plaintiff in the amended complaint." *Id.* at 29 (quoting defendants' response to Miller's discovery request).

It is obvious that prior assaultive incidents involving Silver and related documents reflecting correctional officers' knowledge of any such incidents were highly relevant to Miller's deliberate indifference claim. *See, e.g.*, *Ziemba v. Lajoie*, 2016 WL 5395265, at *4 (D. Conn. 2016) (decision involving same defense counsel and denying defendants' motion for summary judgment on deliberate indifference claim where ample evidence showed DOC's prior knowledge of danger posed by inmate who viciously attacked plaintiff inmate after prison officials put the inmate in same cell with attacker). Even in the more demanding context of an Eighth Amendment claim, if a "plaintiff presents evidence showing that a substantial risk of

9

inmate attacks was longstanding, pervasive, well-documented, or expressly noted by prison officials in the past, and the circumstances suggest that the defendant-official being sued had been exposed to information concerning the risk and thus 'must have known' about it, then such evidence could be sufficient to permit a trier of fact to find that the defendant-official had actual knowledge of the risk." *Farmer*, 511 U.S. at 842-43.

It was wrong for defendants to refuse to produce documents in response to Millers' legitimate discovery requests. By doing so, defendants essentially foreclosed Miller from trying to show that Mann or Cavanaugh (or possibly some other responsible prison official who could be added to the complaint well within the statute of limitations period) actually knew or recklessly should have known of the risk posed by Silver to other inmates.

There is no merit to defendants' claim that Miller was not entitled to the discovery he requested.[4] Contrary to defendants' claim, Miller's discovery request was properly made within the discovery period. Defendants have done nothing to show why Silver's disciplinary and assaultive history is not relevant to Miller's claim. And Miller's request for these clearly relevant documents should have been met with compliance rather than evasion or blaming of a *pro se* prisoner for not earlier seeking the Court's intervention to enforce the obvious.

Even the limited record before me now suggests a chilling possibility that Silver was indeed known to be dangerous to other inmates who were assigned to his cell. Immediately after his unprovoked attack on Miller, he repeatedly warned prison officials that he would attack anyone who was put in the same cell with him. Why was Silver in segregation in the first place?

---

[4] Defendants argue: "No further discovery is warranted. Plaintiff had every opportunity to pursue discovery within the time period set by the scheduling order. Objections filed to certain requests are meritorious. He was provided with the incident report. It is too late now to seek discovery that should have been pursued earlier had plaintiff thought it worthwhile." Doc. #47 at 10; *see also* Doc. #61 (similar arguments).

Is it plausible to think that his violent threats were just a one-day aberrational outburst for an otherwise model inmate?

A deputy warden wrote in an incident report that "the incident can be attributed to the assaultive nature of inmate Silver," Doc. #47-8 at 6, suggesting by implication the possibility that Silver had an assaultive nature previously known to prison officials.[5] Similarly, Silver himself told prison officials very soon after his attack on Miller that he would assault "[a]ny cellie" and that "I just sent one to UCONN." Doc. #47-8 at 48. It is unclear whether his reference to sending someone to "UCONN" is a reference to Miller or perhaps to another recent prior attack victim about whom Mann, Cavanaugh, or another responsible prison official knew or should have known.

Defendants have introduced numerous affidavits and other evidence disclaiming knowledge of any danger posed by Silver or otherwise trying to disassociate themselves with any responsibility for the designation of Miller to the same cell as Silver. If defendants had not stonewalled Miller's discovery request that may have disclosed what they or others at DOC knew (or did not know) about Silver, I might well find these submissions persuasive.[6] But having made a plainly proper discovery request, Miller is entitled to this information and additional discovery before I will consider any further claim that defendants are entitled to summary judgment. *See* Fed. R. Civ. P. 56(d).

---

[5] It is true that the deputy warden's note goes on to say that the incident "can be classified as 'isolated,'" Doc. #47-8 at 6, but it is not clear if this means that the occurrence of the conduct was an "isolated" aberrational surprise to prison officials or that the ongoing risk of repetition was now "isolated" by placing Silver in a cell on his own.
[6] For example, defendants cite records and the "white board" reflecting that Silver was not subject to an isolation or separation order from Miller or other inmates at the time that Miller was placed in the cell with him. If in fact Silver had such a prior assault history that he should have been subject to such an order (and if this was known to Mann or Cavanaugh), then this documentary evidence might be further indication of reckless indifference to Miller's safety.

Accordingly, I will deny without prejudice defendants' motion for summary judgment. Defendants shall respond within 30 days of this order to Miller's discovery requests #2 and #3. Doc. #44 at 29-30.

I shall also grant Miller's request for a settlement conference, and the parties are referred to U.S. Magistrate Judge Robert M. Spector for a settlement conference at such time and date as Judge Spector deems advisable. Although the parties are required to meet with Judge Spector for a settlement conference, they are free as well to conduct their own settlement negotiations prior to meeting with Judge Spector.

## CONCLUSION

For the foregoing reasons, the Court enters the following orders:

**Order re motion for summary judgment.** The Court GRANTS in part and DENIES in part defendants' motion for summary judgment (Doc. #41). The Court GRANTS defendants' motion for summary judgment as to plaintiff's First Amendment claim against defendant Beebe and as to plaintiff's excessive force claim against defendant Mann. The Court DENIES without prejudice to renewal by **May 11, 2019**, defendants' motion for summary judgment as to defendants Mann and Cavanaugh.

**Order re motion to compel discovery.** Plaintiff's motion for order compelling discovery (Doc. #51) is GRANTED. Defendants shall fully respond within 30 days by **April 10, 2019**, to plaintiff's discovery request for "[a]ny and all DR Reports, and incidents involving inmate Silver (assaults, inmates pressing charges against him, CO Assaults, etc.)," and for "Names of all C.O.'s, L.T. and Captains who were involved in stopping inmate Silver's assaults or mental outbursts." The Court interprets these requests to require the disclosure of any and all incident reports, disciplinary reports, and any related documentary materials concerning any assault or

other harmful contact by inmate Mark Silver since 2008 and the names of any correctional officials who were involved in responding to these incidents or who were otherwise made aware of these incidents. If there are any documents reflecting a prior history of assaults by Silver and knowledge by any personnel at MacDougall of Silver's prior assault history, these documents shall be produced. Plaintiff's motion for default entry (Doc. #60) is DENIED as moot in light of this Court's ruling. If the parties mutually agree that they wish to pursue settlement negotiations prior to production of this discovery, then the Court will grant a consent motion for extension of this discovery deadline.

**Order re motion for settlement conference.** Plaintiff's motion for a settlement conference (Doc. #63) is GRANTED. The parties are referred to U.S. Magistrate Judge Robert M. Spector for a settlement conference in accordance with the terms of this ruling and order. The parties are free to conduct their own settlement negotiations if they wish.

**Order re case caption.** The Clerk of Court shall amend the case caption to correctly identify defendant "Cavagnoff" as "Cavanaugh."

It is so ordered.

Dated at New Haven this 11th day of March 2019.

/s/ *Jeffrey Alker Meyer*
Jeffrey Alker Meyer
United States District Judge